Filed 10/4/24  In re R.R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.R., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E083678 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1500079) |
| v. | OPINION |
| M.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

1

In this appeal, M.R. (mother) challenges the denial of her petition to reinstate reunification services. Finding no error, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

A. *Prior Dependency and Criminal History.*

There have been a total of eight referrals regarding mother's children between 2003 and 2021, with three substantiated claims of general neglect.[1] One referral led to the initiation of dependency proceedings that resulted in the termination of mother's parental rights to, and adoption of, two half siblings in December 2009. In 2015, R.R. (born in 2008) and A.G. (born in 2014) were removed from their biological father and placed with mother. Mother's criminal history spans from 2004 to 2015 and includes

---

[1] Mother's child welfare history includes: (1) August 2003—a half sibling missed a substantial amount of school when mother failed to "take the half-sibling to school because she gets drunk and does not wake up in the morning"; (2) July 2004—a half sibling was "unkempt, wore dirty clothes, and had a severe lice infestation" and mother left the half sibling with "different men" when she wasn't home and continued to make excuses not to bring the child to school; (3) August 2004—mother's home was "unhealthy," all the occupants had head lice, and mother allowed the half siblings to play in the street at night and unsupervised; (4) October 2004—mother's boyfriend hit the half siblings, mother shaved a half sibling's head because of lice and would not allow the child to wear a hat, and mother left the half siblings in the car unattended while she visited a strip mall; (5) March 2015—mother left the children (R.R. was six years old and A.G. was six months old) in the biological father's care and he was arrested for child endangerment (he left the children alone in the home within reach of methamphetamine, a butcher knife, and a razor blade), possession of methamphetamine, and being under the influence of a controlled substance; and (6) May 2021—A.G. was a victim of general neglect when it was reported that she "had two accidents [at school] within the last week," and during a virtual meeting with school personnel, mother's "'speech did not sound clear, her thought process did not seem together, she was all over the place, [and she] mumbled and rambled.'"

contributing to delinquency of a minor, possession of cocaine with intent to sell, failure to appear, possession of controlled substances, and disturbance by loud/unreasonable noise.

*B. Present Dependency Petition and Detention.*

On September 21, 2021, Riverside County Department of Public Social Services (Department) received an immediate response referral alleging mother and her live-in boyfriend were involved in a domestic violence altercation. The boyfriend grabbed mother's hair, causing her to fall and take A.G. down as well. Mother filed a police report and asked police to remove boyfriend from her home. She declined to press charges. The boyfriend admitted to the social worker that he used methamphetamine (and "blue pills"/Fentanyl) and had overdosed in the prior two weeks, but denied pulling mother's hair. He said he hears voices but does not take medication for his schizoaffective disorder. The social worker ended the interview when the boyfriend began screaming that "'CPS' had closed his case and [the worker] had no right to be in his home once again."

When the social worker interviewed mother, she stated the children's biological father was deceased. She referred to boyfriend as her "fiancé," maintained that they argued when she refused to let him take her jewelry to sell for drugs, stated that he was diagnosed with split personality disorder, and claimed she did not want him in the house. Mother admitted that she used illicit substances as a youth, was arrested for the sale of narcotics several years ago, and lost custody of her two oldest children who were adopted. A.G. said that boyfriend kicks and pinches mother, or pulls her hair, when he is

3

upset.  R.R. was diagnosed with autism, bipolar disorder, a seizure disorder, and schizophrenia, is a client of the Inland Regional Center, and has an individualized education plan.

A criminal protective order (no contact with an expiration date of September 22, 2024) was issued to restrain boyfriend from being around mother.  The social worker expressed concern that mother continues to expose the children to unsafe people and situations, placing them at risk of abuse and neglect.

On October 5, 2021, the Department filed a petition under Welfare and Institutions Code[2] section 300, alleging mother's actions endangered the health and safety of R.R. and A.G.  According to the petition, mother engaged in a physical altercation with her boyfriend on September 21, 2021 (b-1), has a history of engaging in domestic violence in the children's presence (b-2), has limited ability to protect the children from boyfriend's drug abuse as evidenced by her allowing him to physically abuse her and overdose on drugs in front of the children (b-3), and has a child welfare history of substantiated allegations of general neglect.  On October 20, 2021, mother denied the allegations in the petition, along with Indian heritage.  The juvenile court found the Indian Child Welfare Act did not apply.  It expressed concern about mother's decision to expose her children to boyfriend's drug abuse and violence and noted the case involved "similar relationship issues" as her 2015 dependency case.  The court found sufficient evidence to establish a

---

[2]  All further unattributed statutory references are to the Welfare and Institutions Code.

4

prima facie case under section 300, "reluctantly" followed the Department's recommendation, and ordered the children remain in mother's care.

## C. *Amended Petition and Jurisdiction/Disposition.*

On November 17, 2021, the Department filed a first amended petition adding a count related to mother's child welfare history in Los Angeles (b-5) and mother's history of abusing controlled substances, including alcohol as evidenced by her positive test on September 22, 2021 (b-6). According to the jurisdiction/disposition report, mother claimed the incident with her boyfriend was the only incident of physical violence in their relationship, agreed to call law enforcement if he returned to her home, admitted he has a drug addiction, and minimized her child welfare history, claiming her older children were removed because a maternal aunt "wrongfully reported" her and sabotaged her home. On November 22, 2021, the juvenile court sustained the allegations in the first amended petition except for b-6, declared the children dependents, and ordered family maintenance services. Mother's case plan identified the following family maintenance services: domestic violence program for victims, parenting education, individual therapy, substance abuse testing, and substance abuse services (if appropriate).

## D. *First Six-month Review Report and Hearing.*

According to the family maintenance and status review report filed May 5, 2022, mother had yet to enroll in a domestic violence program, explaining she preferred an in-person program because she had difficulty with online classes; she enrolled in parenting classes on February 22, 2022; she was learning and benefiting from her weekly individual

5

therapy; and in March 2022, she began participating in the substance abuse prevention program. Although mother had positive urine tests for alcohol on September 22 and November 15, 2021, she had not tested during this reporting period. The social worker expressed concerns about mother speaking with boyfriend's mother and wanting to have contact with and support him, even though it was his substance use and domestic violence against her that led to the Department's involvement. Thus, she opined that termination of the dependency "at this time could place the children at risk of further exposure to unsafe situations involving domestic violence and substance use as [mother] has not yet completed her case plan services and continues to minimize her role in the circumstances that led to the Department's involvement."

On May 18, 2022, the juvenile court continued services, but modified the case plan to end substance abuse testing unless mother appeared under the influence.

*E. First Section 387 Supplemental Petition and Detention.*

Two months later, the Department obtained a protective custody warrant and removed the children from mother. R.R. was hospitalized, and A.G. was placed in a foster home. The Department filed a section 387 supplemental petition alleging the previous disposition did not effectively protect the children because mother failed to benefit from services since she allowed boyfriend back into the home despite their extensive domestic violence history.

According to the supplemental detention report filed July 25, 2022, on July 13, the Department received an immediate response referral with allegations of general neglect.

6

Mother allowed boyfriend to stay at her home after his release from jail; the couple argued and engaged in a physical altercation that resulted in boyfriend's arrest. Mother told the children to lie and not say anything about the boyfriend's presence in the home. It was also reported that R.R. wipes mother after she uses the restroom, and she has been seen leaving R.R.'s room at night while half-naked. The social worker met with mother and the children in the home. The children denied seeing boyfriend recently, and R.R. denied assisting mother in the restroom or her being half-naked in his room. Mother denied all allegations made in the recent referral. She claimed that boyfriend showed up to retrieve a bag of his belongings on July 12, refused to leave, and threatened her; thus she sent her friend a text message to call law enforcement. She confirmed that he was under the influence during this incident as his eyes were "huge." She said the children had seen boyfriend and did not know why they denied seeing him when the social worker asked.

After meeting with mother and the children, the social worker received a call from the family specialist, R.V., who said that boyfriend was in the background during two of mother's telehealth sessions in May and June 2022. She knew it was boyfriend because he had introduced himself after walking in on a session. A.G.'s therapist, G.R., also confirmed boyfriend's presence in the home. Mother inconsistently engaged in the children's therapy appointments, but cited transportation issues as the reason. On July 25, A.G.'s caregiver reported that A.G. said "'a guy'" had been in the family's home "every day" and "her mom told her not to tell or they would get taken away." The

7

Department recommended the children remain out of the home while mother works on her personal issues that cause her to continue to place herself and the children at risk.

On July 26, 2022, the juvenile court detained the children from mother, and ordered supervised visits once a week for two hours.

*F. First Section 387 Supplemental Jurisdiction/Disposition Report.*

In preparation for the section 387 jurisdiction/disposition report, the social worker interviewed mother and the children. Mother said that "she did not understand the domestic violence between her and [boyfriend] at the time as she had not yet participated in the domestic violence classes." She claimed that boyfriend manipulated her and made it difficult to end the relationship. Over the past few months, he would "come by her home to pick up his clothes," and on July 12, 2022, he unexpectedly appeared at her door. Mother noticed he was under the influence and asked him to leave, but he refused and threatened her with a knife. Although she reiterated that boyfriend was not living in her home, when asked about him being seen at her home during therapy sessions, mother maintained that he was "not staying there and would not comment on how often or how long [he] would remain in her home." R.R. confirmed that mother's boyfriend came to their home sometimes, and said he was frequently nice to the children but only sometimes nice to mother. R.R. was upset with boyfriend and blamed him for being in foster care. A.G. denied seeing boyfriend in the home.

8

On August 26, 2022, the juvenile court sustained the allegations in the section 387 petition, removed the children from mother, terminated family maintenance services, and ordered her to participate in reunification services.

In the intervening months, mother completed a 10-week domestic violence program and continued to participate in individual therapy; her visitation progressed to unsupervised, overnight/weekend visits. Although mother remained connected to boyfriend through social media, she denied having any contact with him. Both the maternal grandmother and a family friend reported there was no evidence of mother having any contact or relationship with boyfriend. The social worker communicated with several relatives or friends of the family for placement of the children; however, none were able to care for them, meet the criteria, or take both children. The social worker noted that both children were currently placed together in a medically fragile home to meet R.R.'s need.

G. *Children Returned to Mother's Care.*

On January 25, 2023, the juvenile court returned the children to mother's care and ordered family maintenance services. During the next five months, mother appeared to be benefitting from her services; she ended her relationship with boyfriend, was meeting the children's physical and emotional needs, was utilizing community resources when needed, and provided a safe environment for her children. Thus, the Department recommended termination of the dependency and vacatur of all future hearings. However, on July 14, 2023, before the court could consider termination of the

dependency, the Department filed a second section 387 supplemental petition alleging the previous disposition was ineffective in protecting the children because mother failed to benefit from her services as evidenced by boyfriend's presence in her home.

*H. Second Section 387 Supplemental Petition and Detention.*

According to the detention report for the second section 387 supplemental petition, on July 3, 2023, a male called social worker Melissa Martin from mother's phone, and said, "'This is Jack, Isaac's dad.'" When Martin responded, the male quickly ended the call. Martin called mother who claimed that it was the maternal grandfather who had made the call. Mother put the maternal grandfather on the phone, but his voice sounded much older than the original caller. Martin searched Riverside County family law records and discovered that boyfriend has a son named Isaac. Isaac's mother and Martin share the same first name, Melissa. Martin requested law enforcement conduct a welfare check at mother's home, but several hours later boyfriend was not there.

Subsequently, boyfriend called Martin and confirmed that he had called from mother's phone on July 3. He said he hid in the closet while law enforcement searched the home and claimed to have been "in the home continuously since he was released from jail last year." Boyfriend explained that mother did not want him to be homeless; however, after the phone incident mother kicked him out. Boyfriend expressed concern that the children were not being properly cared for because "if he is not there to cook and clean, the children do not eat." He also expressed concern that A.G. gets yelled at a lot while R.R. is talked to sweetly. According to boyfriend, on multiple occasions, he has

10

seen R.R. go into the bathroom while the mother is in there naked. He said he does not know what goes on in there, but he has seen "[R.R.] exit the bathroom with an erection." Boyfriend added that A.G. told a relative that she has to wipe mother's female parts. Boyfriend's sister confirmed that mother remains in a relationship with boyfriend, that he spends a significant amount of time at mother's home, and that the two frequently call each other on the phone.

Martin met with mother and the children at home. R.R. said he has felt "unsafe" in the home recently because boyfriend is mean and threatened to kill him. One night while mother was asleep, boyfriend accused R.R. of "'doing things'" with mother and said he would kill R.R. if he was not honest about it. R.R. said it was not true that mother had touched him, that she asked for assistance in the restroom, or that he had seen her naked. A.G. denied seeing boyfriend in the home. When Martin asked about a mug in A.G.'s room that had boyfriend's name printed on it, A.G. said it was a gift from her mother. Mother denied allowing boyfriend into her home. Regarding his use of her cell phone on July 3, she claimed A.G. took it to him when he asked for it. Martin asked A.G. if she gave mother's phone to boyfriend. A.G. was "hesitant" but when Martin said that she "had already heard from the mother that the boyfriend asked to use the phone," A.G. confirmed that boyfriend asked to use mother's phone to call his son. When Martin asked where boyfriend was when he requested mother's phone, A.G. pointed to mother's bedroom. A.G. "appeared to be on the verge of crying" and agreed with Martin that it was difficult to keep these secrets. Mother maintained boyfriend "force[d] her to be in a

relationship with him," constantly harassing her, and threatening to kill her and R.R. She said the police were no help because they kept releasing him from custody.

On July 12, 2023, the Department obtained a protective custody warrant to remove the children from mother's care for a second time. After he was detained, R.R. disclosed that Mother broke his cell phone because she was angry when he refused to do his chores. According to R.R., "it was normal for his mother to get angry to the point of yelling and breaking things." The juvenile court detained the children and ordered a hair follicle test and psychological evaluation for mother.

*I. Second Section 387 Jurisdiction/Disposition Report and Hearing.*

According to the second section 387 jurisdiction/disposition report, filed August 22, 2023, R.R. denied seeing boyfriend at any point before or after the night he threatened R.R. When the social worker asked about other incidents where mother had confirmed boyfriend's presence, R.R. declined to answer and said he did not feel comfortable talking about the allegations. A.G. stated she could not remember anything. Mother continued to deny allowing boyfriend back into the home and asserted she had benefitted from her services because she now wanted nothing to do with him. She said she could not change her phone number because of "'CPS', 'the schools, etc.'" When she continued to claim that boyfriend had returned to her home to retrieve his clothes, the social worker "reminded [her] that when the children were removed from her care a year ago, she [said that boyfriend's] sister had picked up [his] belongings." The social worker

also noted that mother continued to keep boyfriend's mother's ashes and his bicycles (only recently throwing them away).

Jose Garcia, R.R.'s in home support services worker, stated that he has never seen boyfriend in the home; however, he has witnessed boyfriend call mother, telling her "to find a place for her kids because he was going to kill her" and tell the children that he would make sure they never see her again. A week before the children were removed the second time, mother began calling Garcia daily to report that boyfriend was harassing her. Mother claimed to have called the police numerous times; however, according to police records, they responded to calls on May 13, 2021, September 21, 2021, May 12, 2022, July 12, 2022, and July 7, 2023. Boyfriend called the Department and stated the allegations he made about mother were a result of his mental health issues and drug use, that he was unsure if he was seeing things or what was going on, and that mother does her best for the children and him. Mother participated in weekly visits with the children as well as regular phone contact.

According to the addendum to the second section 387 jurisdiction/disposition report, filed October 5, 2023, the children were doing well in their individual placements, although they missed each other. R.R.'s caregiver reported he was stable on his medication and was scheduled for psychological and medication evaluations. Mother's August 16th hair follicle test was negative for all substances. Her psychological evaluation was conducted on August 27, 2023. Dr. Kenneth Garrett concluded that she grew up in an abusive home and would have been a dependent herself if her situation had

been reported to child protective services. He noted that it is "clear that [mother] has difficulty controlling the flow of her life." He recommended that she show a more consistent capacity to keep a clean home, maintain herself appropriately, prevent any further contact with boyfriend, complete all her classes, and show an understanding that she has to take some responsibility for allowing an individual with substance abuse and violent tendencies into her life. Dr. Garrett stated that if mother could establish "some control over this ongoing issue of her ex-boyfriend interfering [with] and violating her privacy" and show reasonable stability in her life, then "an expansion of her current visitations could occur in the near future." The Department recommended bypassing services under section 361.5, subdivision (b)(10) and (b)(11).

At the section 387 contested jurisdiction/disposition hearing, mother's counsel argued for reunification services because mother has not been in a relationship with boyfriend, has called law enforcement when he shows up, has no control over his actions, and he is no longer living in the area. Counsel argued that mother has completed services before, is living independently, and is applying for financial support from SSI. The juvenile court followed the Department's recommendation and denied reunification services pursuant to section 361.5, subdivision (b)(10) and (b)(11). The court gave little credit to mother's claims, stating: "I do think it's very clear that [boyfriend] was around the home, and the Court's quite concerned with information that the mother was telling to the children regarding not being honest about that situation." The court declined to set a section 366.26 hearing because the children were not a proper subject for adoption, and

14

no one was willing or appropriate to accept legal guardianship. Mother's supervised visits were reduced to a minimum of once a month.

*J. Section 388 Petition, Section 366.3 Post Permanent Plan Review Report, and Hearing.*

On February 8, 2024, mother filed a section 388 petition. She requested the juvenile court order family reunification services. She asserted the changed circumstances involve her attending individual and domestic violence counseling and maintaining consistent visitation and phone contact with the children. Mother explained the requested change was in the children's best interest because they "are very bonded to [her,] have spent their lives in her care[, and their] father is deceased." The court set a hearing for April 9, 2024.

The Department opposed mother's request. Acknowledging her engagement in services, it noted that "this is the second dependency for [her] regarding the same issues of Domestic Violence and Drug Use." While this dependency was established because of domestic violence between mother and boyfriend, and she was granted a restraining order against him, she continued to allow him to enter her home and engage in further domestic violence. On March 15, 2024, one day after mother told the social worker that she had no contact with boyfriend, he called the social worker and said that "he did not feel it is fair that [mother] should lose her children." When asked how he obtained the social worker's contact number, he provided different explanations. Given this evidence, the Department argued the current circumstances show that mother has failed to provide a change in circumstances to suggest that she could protect her children from further neglect.

15

According to the section 366.3 post permanent plan review report, filed March 26, 2024, R.R. continued to participate in psychiatric services for ADHD, an unspecified schizophrenia spectrum and other psychotic disorder, an unspecified depressive disorder, and an autism spectrum disorder. He takes psychotropic medication, has an active IEP, and attends special education classes. He is becoming more talkative, is a very smart child, is making positive changes at school, and is improving his personal hygiene since his caretaker developed a schedule. Although he was doing well in his placement, he expressed a desire to return to mother who was participating in monthly visitation. R.R. and A.G. reside in the same home. The Department recommended legal guardianship; the children's caregiver was committed to their continued placement in her home, but was not committed to legal guardianship.

On April 4, 2024, mother filed a document stating that she had completed her domestic violence victim program on March 29.

At the section 388 hearing, county counsel asked the juvenile court to deny mother's request, submitted on the Department's recommendation as to R.R. (find his psychotropic medication necessary and appropriate) and A.G. (set a section 366.26 hearing as she is adoptable). Mother's counsel asked the court to grant mother's petition, arguing that she had completed a domestic violence program, continued to engage in individual counseling, and consistently visited the children. He stated that mother did not ask boyfriend to call the social worker and claimed she had "no idea how he has injected himself into the situation." He asserted that she denied having contact with boyfriend,

16

denied knowing his current whereabouts, and denied living with him. Counsel preemptively objected to the court making section 366.3 findings as to R.R. and setting a section 366.26 hearing for A.G. The children's counsel submitted on the Department's reports and recommendation, and agreed with the court denying mother's request for services.

After reading and considering all the reports filed for the hearing, the juvenile court denied the section 388 petition, stating: "[a]t this time the Court does not find sufficient change in circumstances to grant the request[,] nor do I think it would be in the children's best interest to grant the request." The court proceeded with the section 366.3 hearing, adopted the findings/recommendations proposed by the Department, found R.R.'s psychotropic medication was appropriate and necessary and set a further section 366.3 hearing. The court also set a section 366.26 hearing for A.G. Mother was advised of her appellate rights. Her counsel restated his objection to the court's actions.

Mother appeals the denial of her section 388 petition, but has not challenged the order setting a section 366.26 hearing for A.G.

## II. DISCUSSION

Mother challenges the denial of her section 388 petition seeking additional reunification services, along with the finding that she has not established changed circumstances and it is not in her children's best interest to reinstate services.

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. [Citation.] 'The petitioner has the burden of showing by a

17

preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child.'" (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence. [Citation.] We may disturb the exercise of the court's discretion only when the court has made an unreasonable or arbitrary determination." (*Id.* at p. 846.)

Initially, we reject mother's claim that the juvenile court "summarily denied [her petition] at the prima facie stage, and . . . prevented [her] from participating in an evidentiary hearing." An evidentiary hearing was held on April 9, 2024, and the court heard argument from mother's counsel regarding her request. The court found mother failed to meet her burden on both prongs. We agree with the court's finding.

Mother asks us to follow the "best interest" factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*): "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." As she acknowledges, the court that decided *Kimberly F.* later rejected application of these factors when the juvenile court has terminated services and set a section 366.26 hearing for selection of a permanent plan. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) Instead, the *J.C.* court followed the

18

Supreme Court's direction in *In re Stephanie M.* (1994) 7 Cal.4th 295, "that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*J.C.*, at p. 527; see *In re Angel B.* (2002) 97 Cal.App.4th 454, 464 ["That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child."].)

Nonetheless, since the juvenile court did not set a section 366.26 hearing for R.R., mother argues the distinguishing factor in *J.C.* is not relevant in the case at hand. We disagree. It is not the selection of a permanent plan that shifts the focus from the parents' performance to the best interest of the children; rather, it is the termination of reunification services. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

We begin by considering whether mother's circumstances have changed. Mother came to the Department's attention in September 2021, after it was reported that she engaged in a domestic violence incident with her boyfriend who, while living in her home, was using drugs and had suffered two overdoses. The boyfriend was arrested, and mother obtained a restraining order. Based on her representation that she would not allow boyfriend to return to her home, the Department recommended, and the juvenile court reluctantly agreed, to allow the children to remain in mother's home under a family maintenance plan. The plan included a domestic violence program for victims, parenting

education, individual therapy, and substance abuse testing, along with not allowing boyfriend in her home. Nonetheless, in July 2022, the children were removed from mother's home after the Department learned that boyfriend had been living with mother, the couple argued, and they engaged in a physical altercation resulting in boyfriend's arrest. Mother lied about boyfriend living in the home and coached the children to lie about his presence.

By Fall 2022, after completing a 10-week domestic violence program and participated in individual therapy, mother claimed she had gained understanding about the violence in her relationship and was no longer in contact with boyfriend. Thus, the children were returned to her home in January 2023. Six months later, they were removed for a second time when the Department discovered that mother had allowed boyfriend to return to the home. Subsequently, mother claimed that boyfriend was not welcome in her home, but she was still in possession of his mother's ashes and his bicycles. When confronted with this information, mother claimed that he would show up and threaten her. Following the children's second removal, mother again claimed that she had stopped communicating with boyfriend; however, in March 2024, he called the social worker to plead mother's case. When asked how he had obtained the social worker's phone number, he provided different explanations. Although mother denied any contact with boyfriend, his call to the social worker suggests otherwise.

Despite receiving more than two years of services, mother has failed to eliminate the primary person who was responsible for the initiation of this dependency, namely,

boyfriend. She has repeatedly exposed her children to his presence in the home and then lied to the Department. When caught in her lie, she blamed boyfriend for not staying away, accusing him of threatening her. She claimed to have called the police on him; however, police records show that only a handful of calls were made by her regarding boyfriend. Mother has also failed to take responsibility for her role in this dependency. Although she now professes to have "moved on and is no longer in contact with [boyfriend]," she has made this same claim many times before. Her acknowledgment that the work is not done, "the road is long," and she is "still early in the process," offers no evidence that she will ever be capable of safely caring for her children. Mother is similar to an addict, but her addiction is boyfriend. The short periods of his absence do not constitute a significant change. (See, e.g., *In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1277 ["short and recent periods of sobriety are often not enough to counter a long-standing pattern of use and relapse"].)

We now consider whether mother has shown that additional services are in the children's best interest. "'[T]o prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate.'" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627.)

According to mother, she is the biological parent who has raised and lived with the children for the majority of their lives, and despite "the at-times chaotic situation at home, [she] has been a steadfast and consistent parent to [them]." She points out that

R.R. stated a desire to return home, and A.G. stated that mother needs her. Claiming neither child has a "sense of permanency at this point," mother argues "it is in their best interest to continue reunification services to [her] so that they can benefit from [her] healing and the work she does. Given their age and paths, it appears [she] will remain in their lives. It is in their best interest to have the best mother they can, and [she] can only achieve that with additional services." The evidence argues otherwise. R.R. has always had extensive mental health needs; however, since being placed with his current caregiver, he has become "more talkative," is making positive changes at school, and is improving his personal hygiene since his caretaker developed a schedule. He is placed with A.G. whose permanent plan is adoption. Moreover, as the Department points out, since mother's section 388 petition did not ask that the children be returned to her care, it is unclear how granting her petition would advance either child's need for permanency and stability.

Because mother failed to show changed circumstances and that more services would promote the children's best interest, the juvenile court did not abuse its discretion by denying her section 388 petition.

## III.  DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER           

J.

We concur:

RAMIREZ           

     P. J.

MENETREZ         

     J.